UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DANIEL ROSA,　　　　　　　　　　*
　　　　　　　　　　　　　　　　*
　　　　　　Petitioner,　　　　　*
　　　　　　　　　　　　　　　　*
　　　　v.　　　　　　　　　　　*
　　　　　　　　　　　　　　　　*　　Civil Action No. 3:15-cv-30073-ADB
BRUCE GELB,　　　　　　　　　　 *
　　　　　　　　　　　　　　　　*
　　　　　　Respondent.　　　　　*
　　　　　　　　　　　　　　　　*
　　　　　　　　　　　　　　　　*

**MEMORANDUM AND ORDER ON PETITION FOR A WRIT OF HABEAS CORPUS**

BURROUGHS, D.J.

On July 2, 2012, a Hampden County Superior Court jury found Petitioner Daniel Rosa ("Petitioner") guilty of murder in the first degree on a theory of deliberate premeditation and of possession of a firearm without a license.  Petitioner was sentenced to life in prison.  Currently pending before the Court is Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  [ECF No. 1].  Petitioner challenges his convictions on three grounds, claiming: (1) that the retroactive application of a substantive change in the law violated his Due Process rights ("Ground One"); (2) that the Massachusetts Supreme Judicial Court's decision affirming the monitoring, recording, and use at trial of his telephone calls from jail violated his First, Fourth, and Fourteenth Amendments rights ("Ground Two"); and (3) that the refusal to require jury unanimity as to whether his guilt was based upon principal or accomplice liability violated his Due Process rights ("Ground Three").  [ECF No. 1 at 5, 7–8].  For the reasons set forth below, Petitioner's petition, [ECF No. 1], is **DENIED**.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

In reviewing a habeas petition from an individual in custody pursuant to the judgment of

a state court, a determination of a factual issue made by the state court shall be presumed to be

correct and "can be rebutted only by clear and convincing evidence to the contrary."  28 U.S.C.

§ 2254(e)(1); RaShad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002) (quoting Ouber v. Guarino, 293

F.3d 19, 27 (1st Cir. 2002)).

The Massachusetts Supreme Judicial Court ("SJC") provided an account of the facts as

the jury could have found them, which is reproduced in relevant part below.

> On January 26, 2011, at approximately noon, the victim, David Acevedo, was killed
> by a single gunshot wound to the back.  The shooting occurred on Riverton Road
> in Springfield, near the home of Eric Caraballo, Sr., a mutual friend of the victim's
> and the [Petitioner's].
>
> Earlier that morning, at 9:30 or 10 A.M., the [Petitioner] had gone to his mother's
> home in Springfield to visit his daughter and to meet with a friend, Marcus Dixon.
> A dark-colored, two-door Honda automobile belonging to Dixon was parked there
> because the [Petitioner] was "holding" the car for Dixon.  The [Petitioner] and
> Dixon left together in the Honda shortly after they both had arrived.   Soon
> thereafter, the [Petitioner] went to Caraballo's house.  At some point the victim also
> arrived at Caraballo's house and confronted the [Petitioner] about money that the
> [Petitioner] purportedly owed him.  A heated verbal exchange ensued and the
> [Petitioner] and the victim began to fight, but Caraballo intervened.  The
> [Petitioner] and the victim went outside to continue fighting while Caraballo
> remained inside.  Several minutes later, the victim returned inside with a ripped,
> bloodied shirt, but he appeared otherwise unhurt.  The [Petitioner] did not return
> inside.
>
> Between approximately 10:30 and 11:30 A.M. the [Petitioner] made and received
> a series of telephone calls to and from Dixon and another friend, Jerell Brunson.
> Just before noon, the [Petitioner] telephoned Caraballo on his cellular telephone
> asking for the victim to meet him outside of Caraballo's house again.  The victim
> and Caraballo went outside and they exchanged additional telephone calls with the
> [Petitioner].  Snowbanks obscured their view of the [Petitioner], but when he
> appeared, the victim went to meet the [Petitioner] near a stop sign at the corner of
> Riverton Road and Denver Street; Caraballo remained in his driveway.  Moments
> later, Brunson and Dixon began walking down from the top of the hill on Denver
> Street toward Riverton Road; Dixon's Honda was parked near the top of the hill.
> As they walked, Brunson and Dixon began shooting in Caraballo's direction.

2

Bullets struck an apartment building across the street from Caraballo's house as well as a car parked in front of that building. The victim turned away from the [Petitioner] and ran across the street toward the apartment building, yelling, "Duck!" Caraballo dropped to the ground and lay on his stomach behind the snow banks, pretending to be shot. The [Petitioner] took several steps toward the victim, who was running away. Caraballo saw the [Petitioner] holding a silver gun covered by a blue bandanna, one arm extended toward the victim. He heard "loud booms" peal from the [Petitioner's] hand. A single bullet struck the victim's back at a straight angle, injuring his spinal cord and causing cardiac arrest. The gunfire ceased and the [Petitioner] turned to Caraballo and said, "Remember that I love you."

The [Petitioner], Brunson, and Dixon retreated quickly up Denver Street toward the Honda. A man who lived on Denver Street, Gary O'Neal, observed a light-skinned man and a dark-skinned man, both holding revolvers, climb into the Honda. Of the three men (the [Petitioner], Brunson, and Dixon), only the [Petitioner] had light skin. The three drove in the Honda to Brunson's house at 39 Slater Avenue, approximately one mile away, where they parted ways.

After being shot, the victim lay on the ground bleeding, and died before the paramedics arrived some minutes later. O'Neal, the Denver Street resident, had observed the rear license plate of the Honda he saw two men climbing into, and he wrote the number in the snow on his front porch. His recollection was close to the rear license plate number on the dark, two-door Honda that police officers later discovered at Brunson's house. Later that day, O'Neal identified the [Petitioner] from a photographic array provided by the police, stating that he was sixty per cent certain it was the man he saw leaving the crime scene holding a revolver.

Police investigators found two of three projectiles that struck the apartment building across the street from Caraballo's house. The projectiles included one .44 caliber bullet and another scrap of lead that was likely the core of a second .44 caliber bullet. The police were unable to recover the bullets that struck the car parked in front of the apartment building, or the bullet that killed the victim. The investigators did not find any shell casings at the crime scene, a fact suggesting that the gunmen used revolvers.

Within hours of the shooting, police encountered Dixon as he approached a parked car outside the [Petitioner's] mother's residence. After ascertaining Dixon's identity, the officers detained him for questioning. Dixon spoke with the officers at the police station, and then drove with them to locations where he had been during and after the shooting, including 39 Slater Avenue, Brunson's house. At that point, two police officers secured the premises of 39 Slater Avenue, leading to the discovery of the Honda parked in back, while other officers obtained a search warrant for the interior of the house. In the basement area where Brunson stayed, police discovered four casings for .357 caliber bullets and one casing for a .38 caliber bullet in a plastic storage unit next to Brunson's bed. They also found two

live .44 caliber bullets in a clay vase on a shelving unit, as well as the [Petitioner's] driver's license stashed in a narrow slit in the underside of the box spring in the bed. Analysis of the shell casings revealed that all the .357 caliber bullet casings were fired from the same weapon, which never has been recovered. At trial, two witnesses testified to seeing the [Petitioner] with a large, silver revolver during the months prior to the murder. Although the [Petitioner] denied possessing such a firearm, he admitted to having previously a .22 caliber gun that he and a friend referred to as a ".350."

In his trial testimony, the [Petitioner] explained that he had met up with both Dixon and Brunson at the [Petitioner's] mother's house in the morning of January 26, 2011, before going to Caraballo's house. Just before noon, Dixon drove Brunson and the [Petitioner] in the Honda directly from the [Petitioner's] mother's house to Caraballo's neighborhood. The [Petitioner] had planned to purchase "crack" cocaine from the victim so that Dixon could resell it. The [Petitioner] had met the victim near the stop sign at the corner of Denver Street and Riverton Road to exchange money for the drugs, which the victim passed to him in a blue cloth, while Caraballo stood in his driveway. Suddenly, Brunson and Dixon began shooting from the top of Denver Street, surprising the [Petitioner] because he was unaware that his friends had guns. Dixon walked nearly all of the way down the hill and shot the victim. After the shooting, the [Petitioner] left the crime scene with Brunson and Dixon in the Honda. The [Petitioner] stated that he did not have a firearm with him at any time during the shooting incident.

The Commonwealth proceeded against the [Petitioner] on the alternative theories of principal and joint venture liability.

Commonwealth v. Rosa, 9 N.E. 3d 832, 834–37 (Mass. 2014).

On March 29, 2011, a Hampden County grand jury indicted Petitioner on charges of murder in violation of Mass. Gen. Laws ch. 265, § 1, [ECF No. 22 ("Add.") at 130], and unlawful possession of a firearm, in violation of Mass. Gen. Laws ch. 269, § 10(a), [id. at 131]. Petitioner's trial began on June 18, 2012. [Id. at 2]. On July 2, 2012, a Hampden County Superior Court jury found Petitioner guilty of murder in the first degree on a theory of deliberate premeditation and possession of a firearm without a license. [Id. at 7]. Petitioner was sentenced to life in prison. [Id.]. He appealed his conviction to the SJC, which affirmed the conviction on May 20, 2014. Rosa, 9 N.E.3d at 834, 844.

4

On April 22, 2015, Petitioner filed his petition for writ of habeas corpus, raising his three grounds for relief.  [ECF No. 1 at 5, 7–8].  In August 2015, Respondent moved to dismiss the petition, asserting that Petitioner had failed to exhaust state remedies regarding his Ground One claim—that the retroactive application of state law to his case violated his Due Process rights. [ECF No. 18 at 1].  After initially finding that Petitioner had to either voluntarily dismiss Ground One of his habeas petition or face dismissal of the entire petition, [ECF No. 26 at 6], the Court entered an order on February 1, 2016, finding that Petitioner met the requirement for a stay and abeyance and allowing him the opportunity to exhaust his claim.  [ECF No. 32 at 3].  Petitioner filed a motion for a new trial in Hampden County Superior Court which was denied, [ECF No. 33-1], and then a petition for leave to appeal the denial of his motion for new trial pursuant to Mass. Gen. Laws ch. 278, § 33E, [ECF No. 33-2].  A single Justice of the SJC denied his § 33E petition on August 9, 2017.  [Id.].  His subsequent motion for reconsideration was likewise denied.  [ECF No. 33-3].  On September 4, 2017, Petitioner filed a notice in this case, informing the Court that he had exhausted his claim and the Court lifted the stay.  [ECF Nos. 33, 34].

## II.    LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas relief on claims previously adjudicated on the merits only after the petitioner has exhausted all available state remedies.  28 U.S.C. § 2254(b)–(c); see O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (noting that Section 2254(c) requires that state prisoners give state courts a fair opportunity to review their claims and correct alleged constitutional violations before review by a federal court).  Assuming that the exhaustion requirement has been satisfied, the AEDPA permits habeas relief only if the previous adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme

5

Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court arrives at a conclusion contrary to that reached by the Supreme Court on a question of law, or if the court decides a case differently from a decision of the Supreme Court on a materially indistinguishable set of facts. Williams v. Taylor, 529 U.S. 362, 404–05 (2000). A state court unreasonably applies federal law when it "correctly identifies the governing legal principles, but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply." Gomes v. Brady, 564 F.3d 532, 537 (1st Cir. 2009) (citation omitted). An unreasonable application requires "some increment of incorrectness beyond error." Norton v. Spencer, 351 F.3d 1, 8 (1st Cir. 2003) (citation omitted). A petitioner must show that the state court decision applied clearly established law in a way that was "objectively unreasonable." Sanchez v. Roden, 753 F.3d 279, 299 (1st Cir. 2014) (quoting White v. Woodall, 572 U.S. 415, 419 (2014) (citation omitted)).

Thus, to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991) (citing 28 U.S.C.

§ 2241).  "Errors based on violations of state law are not within the reach of federal habeas petitions unless there is a federal constitutional claim raised."  Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006) (citing Estelle, 502 U.S. at 67–68).  "'[T]he gap between erroneous state court decisions and unreasonable ones is narrow,' and 'it will be the rare case that will fall into this gap . . . .'"  O'Laughlin v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009) (quoting Evans v. Thompson, 518 F.3d 1, 6 (1st Cir. 2008)).

The AEDPA presumes that the state court's factual findings are correct and requires rebuttal by the petitioner with "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); see Cullen v. Pinholster, 563 U.S. 170, 181 (2011) ("The petitioner carries the burden of proof."); see also Linton v. Saba, 812 F.3d 112, 116 (1st Cir. 2016) ("We must accept the state court findings of fact unless convinced by clear and convincing evidence that they are in error." (internal citation and punctuation omitted)).  The factual findings include "'basic, primary, or historical facts,' such as witness credibility and recitals of external events."  Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007) (quoting Sanna v. DiPaolo, 265 F.3d 1, 7 (1st Cir. 2001)).

## III.   DISCUSSION

### A.   Ground One: Retroactive Application of Commonwealth v. Britt

In Ground One of his petition, Petitioner claims that the SJC's retrospective application of Commonwealth v. Britt, 987 N.E.2d 558 (Mass. 2013), violated his Due Process rights.  [ECF No. 43 at 7].  In that case, the SJC held that "in cases tried hereafter, juries should not be instructed that the Commonwealth must prove that a joint venturer knew that the principal was armed to return a conviction of murder based on deliberate premeditation."  Britt, 987 N.E.2d at 569; see Rosa, 9 N.E.3d at 842–43 (citing and applying Britt).  The SJC applied Britt to Petitioner's appeal and determined that the trial court's failure to instruct the jury regarding

Petitioner's knowledge as to whether his co-venturers were armed was not erroneous.  Rosa, 9 N.E.3d at 843.

        1.       Procedural Default

Respondent now argues that Petitioner's Ground One claim is procedurally defaulted because "a single Justice of the SJC denied the [P]etitioner leave to appeal from the denial of his motion for new trial on grounds that the [P]etitioner's claim was not new within the meaning of Mass. Gen. Laws c. 278 § 33E."  [ECF No. 44 at 15].

As an initial matter, because Petitioner's Ground One Due Process claim was not raised in his initial appeal to the SJC, that claim was not exhausted through his first round of appeals and he therefore had not exhausted the claim for purposes of habeas review at the time he filed his habeas petition with this court.  See generally Rosa, 9 N.E.3d 832; [Add. at 22–81 (Petitioner's appellate brief); id. at 338–360 (Petitioner's appellate reply brief)].  Though he did challenge the application of Britt in that initial appeal to the SJC, he did not raise this challenge as a constitutional claim, nor did he cite relevant Supreme Court precedent or otherwise alert the SJC to the possibility that he was making a Due Process claim.  See [Add. at 355–58 (arguing that the controlling law in his appeal should be the case law that was in place prior to his conviction)].  The exhaustion requirement for habeas review is satisfied only if "a petitioner can successfully claim that he has presented the same legal theory to the state court by presenting the substance of a federal constitutional claim in such a manner that it 'must have been likely to alert the court to the claim's federal nature.'"  Dougan v. Ponte, 727 F.2d 199, 201 (1st Cir. 1984) (quoting Daye v. Attorney Gen. of N.Y., 696 F. 2d 186, 192 (2d Cir. 1982) (en banc)).  Thus, this Court, after finding that Petitioner had failed to exhaust this claim, [ECF No. 26 at 5], granted a stay and abeyance to give him the opportunity to exhaust his claim, [ECF No. 32 at 4].

Thereafter the Superior Court denied Petitioner's motion for a new trial, [ECF No. 33-1], and he filed a petition with the SJC for leave to appeal to the full court the denial of his motion for a new trial. This petition was denied by a single Justice of the SJC. [ECF No. 33-2]; Commonwealth v. Rosa, SJ-2017-0119, (Mass. Aug. 8, 2017). In denying that petition, the single Justice quoted Commonwealth v. Gunter for the proposition that "[a]n issue is not 'new' within the meaning of G. L. c. 278, § 33E, where either it has already been addressed, or where it could have been addressed had the defendant properly raised it at trial or on direct review." Rosa, SJ-2017-0119 at 2 (quoting 945 N.E.2d 386, 393 (Mass. 2011). The single Justice found that, because Petitioner had challenged the application of Britt in his initial appellate reply brief, see [Add. at 355–58], his Due Process claim "could have been addressed" through his initial appeal and was therefore not new despite the fact that Petitioner had not raised it earlier. See Rosa, SJ-2017-0119, at 2–3. The claim is now exhausted based on the finding of the single Justice that the claim had been procedurally defaulted.

"The independent and adequate state ground doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement. In these cases, the state judgment rests on independent and adequate state procedural grounds." Coleman v. Thompson, 501 U.S. 722, 729–30 (1991), holding modified by Martinez v. Ryan, 566 U.S. 1 (2012); see also Simpson v. Matesanz, 175 F.3d 200, 206 (1st Cir. 1999). "A determination by the single gatekeeper justice [of the SJC] that the issues presented in an appeal [under § 33E] are neither 'new' nor 'substantial' is an adequate and independent state-law ground precluding habeas relief when it rests on grounds of procedural waiver in the trial court." Jewett v. Brady, 634 F.3d 67, 76 (1st Cir. 2011) (citing Matesanz, 175 F.3d at 206–07); see Lee v. Corsini, 777 F.3d 46, 55 (1st Cir. 2015) (noting that

an issue is not "new" under § 33E if it has already been addressed, or if it could have been addressed had the defendant properly raised it at trial or on direct review (quoting Commonwealth v. Ambers, 493 N.E.2d 837, 839 (Mass. 1986)).  The Court therefore finds that Petitioner's Ground One Due Process claim has been procedurally defaulted.

"Because the SJC resolved [Petitioner's] claim on state law grounds, [this Court] may only review this claim if [Petitioner] establishes 'cause and prejudice' with respect to the procedural default," Horton v. Allen, 370 F.3d 75, 81 (1st Cir. 2004), or "a fundamental miscarriage of justice," id. at 81 n.3; see Logan v. Gelb, 790 F.3d 65, 72–73 (1st Cir. 2015).  In order to satisfy cause, a petitioner "must show 'that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule."  Horton, 370 F.3d at 81 (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).  Petitioner has made no such showing.[1] The alternative theory, the fundamental miscarriage of justice exception, is very narrow and "applies only in extraordinary circumstances—circumstances in which a petitioner makes some showing of actual innocence."  Janosky v. St. Amand, 594 F.3d 39, 46 (1st Cir. 2010).  Petitioner has also failed to demonstrate actual innocence and has therefore failed to establish a fundamental miscarriage of justice.  As a result, the SJC's decision that this claim was procedurally defaulted "is an independent and adequate ground for decision," precluding habeas review on the merits of his claim.  See Horton, 370 F.3d at 80–81.

---

[1] Petitioner argues in his reply brief that the Court implicitly found cause and excused Petitioner's default when it granted a stay and abeyance to allow him to pursue his Due Process claim in state court.  [ECF No. 47 at 2].  Although the Court found cause for a stay and abeyance, Petitioner is incorrect in claiming that the Court, at that time, could have or would have excused a procedural default.  In giving Petitioner an opportunity to exhaust his claim in state court, the Court must now be bound by the state court's decision as to that claim.  See Jewett, 634 F.3d at 76.

2.      Merits of Retroactivity Claim

Even assuming, arguendo, that Petitioner's Ground One claim was not procedurally defaulted, Petitioner would not succeed on the merits of this claim.  Petitioner argues that "it was clear [before Britt] that a defendant charged with deliberately premeditated joint venture murder where a weapon was used, had the right to require the Commonwealth [to] prove he had knowledge that a co-venturer was armed[.]"  [ECF No. 47 at 5].  Petitioner also claims that this change "was not foreseeable and thus was unexpected."  [ECF No. 43 at 14].  Respondent contends that Petitioner is not entitled to habeas relief even on the merits "because the holding in Britt was not 'unexpected and indefensible by reference to existing law' and, therefore, its application to the petitioner's case did not violate his due process rights."  [ECF. No. 44 at 19].

"Constraints on judicial retroactivity are rooted in 'core due process concepts of notice, foreseeability, and, in particular, the right to fair warning as those concepts bear on the constitutionality of attaching criminal penalties to what previously had been innocent conduct.'" Marshall v. Bristol Superior Court, 753 F.3d 10, 17–18 (1st Cir. 2014) (citing Rogers v. Tennessee, 532 U.S. 451, 459 (2001)).  "[T]he Supreme Court's concern with fair notice goes beyond actual reliance. . . .  [S]ome court-made changes in criminal law may be so surprising and troubling ('unexpected and indefensible') as to offend a sense of fair warning even if the defendant probably paid no attention to the case law."  United States v. Lata, 415 F.3d 107, 111 (1st Cir. 2005) (quoting Bouie v. City of Columbia, 378 U.S. 347, 354 (1964)).  See generally Rogers, 532 U.S. 451; Marks v. United States, 430 U.S. 188 (1977).

Unlike changes to statutory law, however, Due Process concerns are less heightened when state courts retroactively apply changes to common law:

> In the context of common law doctrines . . . there often arises a need to clarify or even to reevaluate prior opinions as new circumstances and fact patterns present

11

themselves.   Such judicial acts, whether they be characterized as 'making' or
'finding' the law, are a necessary part of the judicial business in States in which the
criminal law retains some of its common law elements.  Strict application of *ex post
facto* principles in that context would unduly impair the incremental and reasoned
development of precedent that is the foundation of the common law system.  The
common law, in short, presupposes a measure of evolution that is incompatible with
stringent application of *ex post facto* principles.

Rogers, 532 U.S. at 461.  As a result, "a judicial alteration of a common law doctrine of criminal

law violates the principle of fair warning, and hence must not be given retroactive effect, only

where it is 'unexpected and indefensible by reference to the law which had been expressed prior

to the conduct in issue.'"   Rogers, 532 U.S. at 462 (quoting Bouie, 378 U.S. at 354).

"In Massachusetts, first degree murder is 'committed with deliberately premeditated

malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted

commission of a crime punishable with death or imprisonment for life.'"   Morgan v. Dickhaut,

677 F.3d 39, 48 (1st Cir. 2012) (quoting Mass. Gen. Laws ch. 265, § 1).  "To succeed on a theory

of deliberately premeditated murder as a joint venturer under our present articulation of the law,

the Commonwealth was required to prove that the defendant was '(1) present at the scene of the

crime, (2) with knowledge that another intends to commit the crime or with intent to commit a

crime, and (3) by agreement, [was] willing and available to help the other if necessary.'"

Commonwealth v. Zanetti, 910 N.E.2d 869, 875 (Mass. 2009) (alteration in original) (quoting

Commonwealth v. Green, 652 N.E.2d 572, 578 (Mass. 1995)).

Petitioner is correct that, prior to Britt, there were several SJC opinions which stated that,

in order to convict on a theory of deliberately premeditated joint venture murder, the prosecution

also had to prove a defendant's knowledge that a co-venturer was armed.  [ECF No. 47 at 5].  In

Britt, the SJC "acknowledged a line of cases that stands for the proposition that a conviction for

deliberately premeditated murder on a theory of joint venture requires proof that the joint

venturer had knowledge that at least one member of the joint venture possessed a weapon." 987

N.E.2d at 568 (referring to Zanetti, 910 N.E.2d at 875 n.8, Green, 652 N.E.2d at 578,

Commonwealth v. Phillips, 897 N.E.2d 31, 44 (Mass. 2008), and Commonwealth v. Lydon, 597

N.E.2d 36, 39 n.2 (Mass. 1992)).  The Britt decision also referenced a second line of SJC

opinions which held that knowledge that a co-venturer was armed was not a required element for

a theory of extreme atrocity joint venture murder.  Id. at 569; see Commonwealth v. Pov

Hour, 841 N.E.2d 709, 715 (Mass. 2006); Commonwealth. v. Semedo, 665 N.E.2d 638, 642

(Mass. 1996); Commonwealth. v. Colon-Cruz, 562 N.E.2d 797, 807 (Mass. 1990).  There was

yet a third line of SJC decisions that required knowledge that a co-venturer was armed in felony

joint venture murder cases where possession of a weapon was an element of the felony.  Britt,

987 N.E.2d at 568.  See generally Commonwealth v. Melendez, 692 N.E.2d 61 (Mass. 1998);

Commonwealth v. Claudio, 634 N.E.2d 902 (Mass. 1994).

After reviewing this case law, the SJC in Britt found that the line of cases on joint venture

premeditated murder was "based on a misapplication of the principle that knowledge of a

weapon is an element of the Commonwealth's proof when a defendant is prosecuted on a theory

of joint venture where an element of the predicate offense is use or possession of a dangerous

weapon."  Britt, 987 N.E.2d at 568.  In order to correct this error, the SJC held that "[t]he

Commonwealth should only bear the burden of proving that a joint venturer had knowledge that

a member of the joint venture had a weapon where the conviction on a joint venture theory is for

a crime that has use or possession of a weapon as an element."  Id. at 569.  As a result, the

prosecution is not required to prove knowledge of a weapon in joint venture murder cases that

raise theories of deliberate premeditation or extreme atrocity.  See id.

It was foreseeable and reasonable for the SJC to correct the "misapplication" of cases which required an additional element on a joint venture theory of murder that was not, in fact, required by statute or common sense.  As the Court observed in its 2015 Order on Respondent's motion to dismiss, "[t]he holding in Britt was not so 'unexpected and indefensible' that the SJC could not apply it retroactively" to Petitioner.  [ECF No. 26 at 7].  Thus, "[f]ar from a marked and unpredictable departure from prior precedent," the SJC's "decision was a routine exercise of common law decisionmaking in which the court brought the law into conformity with reason and common sense."  Rogers, 532 U.S. at 467.  Therefore, the SJC's retroactive application of Britt was not contrary to clearly established Supreme Court precedent.  Williams, 529 U.S. at 412–13.

Finally, even assuming that the SJC was incorrect in finding that the trial court's instructions as to knowledge that a co-venturer was armed was not in error, Petitioner has failed to demonstrate that he was prejudiced by any potential trial court error.  "[H]abeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).  Constitutional error is harmless unless it "had [a] substantial and injurious effect or influence in determining the jury's verdict."  Id. (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)); Foxworth v. St. Amand, 570 F.3d 414, 425 (1st Cir. 2009) ("Even if a state-court decision is determined to involve an unreasonable application of clearly established Federal law, habeas relief will not follow automatically.  The error must be shown to have 'had a substantial and injurious effect or influence in determining the jury's verdict.'" (quoting Delaney v. Bartee, 522 F.3d 100, 105 (1st Cir. 2008))); see also Medina v. Roden, No. 11-cv-10615, 2012 U.S. Dist. LEXIS 108168, at *15–16 (D. Mass. July 2, 2012) ("This stringent test recognizes that the 'writ of habeas corpus has historically been

14

regarded as an extraordinary remedy,' which is only available to 'persons whom society has grievously wronged.'" (quoting <u>Brecht</u>, 507 U.S. at 633–34)).

The Court finds that no prejudice resulted from the trial court's failure to instruct the jury on joint venture premeditated murder.  As the Superior Court and the SJC both observed, Petitioner was not prejudiced where the weight of the evidence demonstrated that Petitioner was armed, fired the shot that killed the victim, spoke with his co-venturers just prior to the shooting, was seen shooting at the victim with his co-venturers, and—after the shooting—police found Petitioner's license along with shell casings and ammunition at his co-venturer's house.  <u>See</u> <u>Rosa</u>, 9 N.E.3d at 843 n.24 (reciting evidence in support of finding that there was sufficient evidence of joint venture); [ECF No. 43-4 at 12 (2017 Superior Court Order) (stating "there is no risk that the failure to so instruct may have resulted in a miscarriage of justice" and listing evidence against Petitioner)].  "Our review of the evidence indicates that, even if the jury had [not been influenced by the error], the substance of the case against [petitioner] would have remained the same.  The other evidence, moreover, was considerable." <u>Gilday v. Callahan</u>, 59 F.3d 257, 269–70 (1st Cir. 1995).  The Court finds that the trial court's instructions, even if erroneous, did not have a substantial influence on the jury, nor is the Court in "grave doubt" as to the influence, if any, of a potential error.  <u>See</u> <u>Kotteakos</u>, 328 U.S. at 765, 776.

**B.     Ground Two: Monitoring of Petitioner's Phone Calls**

Petitioner next claims that his First and Fourth Amendment rights were violated when his "telephone calls were recorded and later reviewed by a prison officer without any demonstrated justification for that review, and without evidence of valid regulations governing and allowing

that review." [ECF No. 47 at 10].[2]  Respondent counters that Petitioner has failed to identify any

Supreme Court precedent that is contrary to the SJC's holding.  [ECF No. 44 at 25–26].

　　　While being held in pretrial detention at the Hampden County House of Correction

("HCHC"), Petitioner placed a telephone call which was recorded by prison staff.  Rosa, 9

N.E.3d at 838.[3]  The recorded call, which was shared with law enforcement authorities, "covered

a range of topics, including the events surrounding the shooting and killing of the victim on

January 26, 2011, the people who were present during the shooting incident, and a general

discussion about guns."  Id. at 838–39.  In his direct appeal before the SJC, Petitioner "argue[d]

that jail officials violated his rights under the First and Fourth Amendments by monitoring and

recording his telephone conversation and by forwarding a summary of it to law enforcement

---

[2] In his petition, Petitioner also claims that his Fourteenth Amendment rights were violated.
[ECF No. 1 at 7].  Petitioner did not raise a Fourteenth Amendment claim with the SJC, nor does
he develop a Fourteenth Amendment claim in his memorandum in support of his petition or
reply brief, therefore the Court focuses its analysis on Petitioner's First and Fourth Amendment
arguments.  See Rosa, 9 N.E.3d at 841 ("The defendant argues that jail officials violated his
rights under the First and Fourth Amendments by monitoring and recording his telephone
conversation and by forwarding a summary of it to law enforcement officials . . . ."); [Add. at
54–64 (Petitioner's appellate brief, raising only First and Fourth Amendment arguments); Add.
at 352–355 (Petitioner's appellate reply brief, focusing on Fourth Amendment argument); ECF
No. 43 at 25 ("Petitioner's argument was and is premised on clearly established Supreme Court
law requiring penal institutions to have in place valid, neutral regulations based on legitimate
penological needs justifying restrictions on prisoners' First and Fourth Amendment rights.");
ECF No. 47 at 10 ("This case involves the restriction and violation of Petitioner's First and
Fourth Amendment rights by officials at the Hampden County House of Corrections, where
Petitioner was being detained pending trial.")].

[3] Petitioner was on notice that his calls were being monitored:

　　　Officer Jessica Athas, an intelligence officer at [HCHC] testified that the warning
　　　of monitoring and recording is included in the inmate handbook and is posted near
　　　the inmate telephones, and at the outset of each telephone call, a recorded voice
　　　tells the inmate and other participants on the call that the call is being recorded.

Rosa, 9 N.E.3d at 841 n.19.

without any showing of a legitimate penological purpose for doing so." Id. at 841.  The SJC

upheld the admission of the phone call at trial.  Id. at 841–42.

As the SJC noted in describing Petitioner's claims on direct appeal, "the defendant cites

both the First and Fourth Amendments to the United States Constitution, but the principal

constitutional claim appears to be lodged in the Fourth Amendment and, specifically, the

protection offered by the amendment to a person's reasonable expectation of privacy." Rosa, 9

N.E.3d at 841 n.18.  There, as here, the parties do not contest that inmates retain First

Amendment rights in their communications or that those rights may be restricted.  See [ECF No.

43 at 26 (Petitioner's memorandum, acknowledging that "[a] penal institution has the right to

restrict a detainee's communications per regulations that are reasonably related to legitimate

penological needs"); ECF No. 44 at 28, 29 (Respondent's memorandum, stating that defendants

retain constitutional rights in communications but that they may be restricted)].  As Petitioner

states in his reply brief, he does not object to the recording of inmates' calls generally, but to the

recording of his calls in particular, [ECF No. 47 at 15], as well as to the use of those recordings

at trial.  Petitioner argues that the Commonwealth was required to introduce into evidence the

specific regulations that governed monitoring of pretrial detainees' calls in order to demonstrate

that there was a legitimate penological purpose for monitoring his calls in particular.  [ECF No.

43 at 29–30].

As Respondent notes, Petitioner fails to identify a Supreme Court holding that directly

addresses inmates' privacy interests in telephone calls.  [ECF No. 44 at 28].  The cases Petitioner

does cite, as already noted by the SJC,  "do not support [Petitioner's] implicit claim that the

decisions of this court cited here in the text are contrary to the requirements of the First and

Fourth Amendments." Rosa, 9 N.E.3d at 842 n.21.  Those cases involve mail sent from inmates

to inmates, Turner v. Safley, 482 U.S. 78 (1987), mail sent from inmates to individuals outside of prison, Procunier v. Martinez, 416 U.S. 396 (1974), and materials received by inmates through the mail, including subscriptions, Thornburgh v. Abbott, 490 U.S. 401 (1989), and books, Bell v. Wolfish, 441 U.S. 520 (1979).  See [ECF No. 43 at 25–26].  Petitioner also cites the Supreme Court's holding in Katz v. United States, 389 U.S. 347 (1967), but again, that case did not involve the monitoring of inmates' telephone calls.

When conducting habeas review, courts "must look for Supreme Court precedent that either 'squarely addresses the issue' in the case or that articulates legal principles that 'clearly extend' to the new factual context."  Brown v. Ruane, 630 F.3d 62, 69 (1st Cir. 2011).  While it might be possible to extend the cases cited by Petitioner from mail sent to or from inmates to telephone calls, that is not what Petitioner asks the Court to do.[4]  Instead, Petitioner asks the Court to find that state courts have the burden of introducing regulations into evidence in order to use recordings from inmate calls at trial.  [ECF No. 43 at 31 ("The burden was on the Commonwealth to establish the constitutional validity of the regulations pursuant to which the monitoring of Petitioner's calls was conducted.")].  None of the cases cited by Petitioner support

---

[4] As Respondent notes, the Second, Seventh, Ninth, and Tenth Circuits have held that inmates' calls may be recorded and/or monitored.  See [ECF No. 44 at 30–31 (citing cases)].  The First Circuit has also held that inmates' calls may be recorded.  "A telephone call can be monitored and recorded without violating the Fourth Amendment so long as one participant in the call consents to the monitoring."  United States v. Novak, 531 F.3d 99, 101–02 (1st Cir. 2008) (citing United States v. White, 401 U.S. 745 (1971) (plurality opinion)).  In United States v. Novak, the First Circuit held that "inmates and pretrial detainees who have been exposed to the sort of warnings that [defendant] saw here have been deemed to have consented to monitoring," id. at 102, and therefore those calls could "be introduced into evidence consistently with the requirements of the Fourth Amendment," id. at 103.  The First Circuit further held that, even though prison officials failed to follow state regulations regarding monitoring and recording of the defendant's calls, the defendant's consent and the viability of the evidence under the Fourth Amendment was not affected by their error.  Id. at 102–03 ("We thus find no reason to believe that [defendant's] consent was vitiated by the prison officials' failure to abide by the applicable regulations.").

18

imposing such a burden, and in fact, the Supreme Court has held the opposite: "[t]he burden . . .

is not on the State to prove the validity of prison regulations but on the prisoner to disprove it."

Overton v. Bazzetta, 539 U.S. 126, 132 (2003).  If Petitioner felt that the regulations regarding

recording and monitoring of inmate calls was invalid on its face and/or as applied to him, he had

the opportunity to enter the regulations into evidence himself and challenge them at trial, but he

did not do so.  See Rosa, 9 N.E.3d at 842 n.20 ("The defendant did not raise any point about the

nonproduction of regulations when arguing against the admission of the recorded jail call before

or at trial, and we have not made the production of a correctional facility's telephone monitoring

regulations a condition precedent to admission of evidence of any recorded calls.").

Petitioner has thus failed to demonstrate that the SJC's holding was contrary to or an

unreasonable application of clearly established Supreme Court precedent.  See Williams, 529

U.S. at 404–05.  Accordingly, his Ground Two argument does not entitle him to relief.

### C.    Ground Three: Use of a General Verdict Form

Petitioner's final challenge is to the trial court's refusal to provide the jury with a

unanimity instruction or to use a special verdict slip due to what he describes as alternate theories

of principal and accomplice liability.  [ECF No. 43 at 34–35].  Respondent maintains that the

SJC's finding of no error was consistent with SJC precedent, specifically Commonwealth v.

Zanetti, 910 N.E.2d at 869, and further, that the finding is unreviewable because it is a decision

of a state court that was applying state law.  [ECF No. 44 at 39].

At trial, Petitioner asked the judge to give the jury a specific unanimity instruction and to

provide "them with a special verdict slip to clarify the specific grounds of conviction" as part of

his charge on accomplice liability.  Rosa, 9 N.E.3d at 843–44.  The trial judge declined to do so,

and, on appeal, the SJC ruled that the jury instructions on accomplice liability and the use of a

general verdict slip were proper.  Id. at 844.  Petitioner claims that, because the Commonwealth

bears the burden of proving—and the jury must find—each element of a crime beyond a

reasonable doubt, the SJC's application of Zanetti was a violation of his Due Process rights and

contrary to clearly established federal law.  [ECF No. 43 at 35 (citing Apprendi v. New Jersey,

530 U.S. 466, 476–77 (2000); In Re Winship, 397 U.S. 358, 364 (1970)).  Citing the

Massachusetts statute that defines accomplice liability, Petitioner argues that the statute requires

the Commonwealth to prove and the jury to find that an accomplice is guilty of aiding and

abetting.  [Id. at 37–38].  The statute in question provides that, "[w]hoever aids in the

commission of a felony, or is accessory thereto before the fact by counselling, hiring or

otherwise procuring such felony to be committed, shall be punished in the manner provided for

the punishment of the principal felon."  Mass. Gen. Laws ch. 274, § 2.  Although Petitioner

argues that accomplice and principal liability are "different crimes," and reflect separate theories

of liability, this is inconsistent with the SJC's interpretation of the statute.  [ECF No. 47 at 19].

 Zanetti, decided in 2009, clarified the SJC's earlier ruling in Commonwealth v. Santos,

797 N.E.2d 1191 (Mass. 2003), in which the SJC determined that under Massachusetts law,

principal and joint venture liability are not different theories of guilt, and that there is therefore

no need for a jury to make separate findings as to each theory of liability on a special verdict

form.  Zanetti, 910 N.E.2d at 881.  Under the applicable statute, Chapter 274, § 2, the fact that an

accomplice faces the same punishment as a principal led the SJC to "renounce the false

distinction between a principal and an accomplice, and . . . recognize[] that the accomplice

commits the crime no less than the principal . . . ."  Id.  The SJC held that general verdict forms

were permitted "even when there is differing evidence that the defendant committed the crime as

a principal or as an accomplice."  Id. at 884.  And further, that the standard of review on appeal

was to determine whether there was sufficient evidence for a juror to determine "beyond a reasonable doubt that the defendant knowingly participated in the commission of the crime charged, with the intent required to commit the crime, rather than examine the sufficiency of the evidence separately as to principal and joint venture liability." Id. at 884.  On appeal, the SJC applied this standard and declined to reverse Zanetti.  Rosa, 9 N.E.3d at 842–43.

Petitioner fails to identify any clearly established Supreme Court precedent that is contrary to the SJC's holding in either Zanetti or Rosa.  See 28 U.S.C. § 2254(d).  The Supreme Court cases which Petitioner cites, see [ECF No. 43 at 36; ECF No. 47 at 16], do not address general versus special verdicts or specific unanimity instructions in cases where the defendant was tried as both a principal and accomplice, see, e.g., In re Winship, 397 U.S. at 368 (deciding that Due Process requires application of the proof beyond a reasonable doubt standard during the adjudicatory stage of a delinquency proceeding); Apprendi, 530 U.S. at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").  Where the statute at issue here indicates that accomplices face the same penalty as principals, the SJC's holding in Rosa (applying Zanetti) does not violate clearly established federal law.

The Supreme Court has "stated many times that 'federal habeas corpus relief does not lie for errors of state law.'"  Swarthout v. Cooke, 562 U.S. 216, 219 (2011) (quoting Estelle v. McGuire, 502 U.S. 62, 67 (1991)).  "Instructions in a state trial are a matter of state law to which substantial deference is owed."  Lucien v. Spencer, No. 07-cv-11338, 2015 U.S. Dist. LEXIS 134154, at *34 (D. Mass. Sep. 30, 2015) (quoting Niziolek v. Ashe, 694 F.2d 282 (1st Cir. 1982)).  "In reviewing the habeas petition of a state prisoner," a federal court's "function ends when [it] determine[s] that the challenged jury instructions violated no federal constitutional

rights of the petitioner." <u>Niziolek</u>, 694 F.2d at 290.  Petitioner has failed to demonstrate that the SJC's application of <u>Zanetti</u>—which held that principal and accomplice liability are not separate crimes and therefore do not require a special verdict slip or proof beyond a reasonable doubt as to each theory of liability—was not a violation of federal law.  Petitioner is therefore not entitled to habeas relief on this ground.

## IV.   CONCLUSION

Accordingly, Petitioner's petition for a writ of habeas corpus, [ECF No.1], is <u>DENIED</u>.  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to" a habeas petitioner.  Rules Governing Section 2254, Cases, R. 11(a).  The Court declines to grant a certificate of appealability.

**SO ORDERED.**

June 29, 2020                                                    /s/ Allison D. Burroughs
                                                                ALLISON D. BURROUGHS
                                                                U.S. DISTRICT JUDGE